IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Anna Peppers-Moss,                          :
                Plaintiff          :        Civil Action 2:10-cv-01054

      v.                                    :        Judge Watson

Michael J. Astrue,                          :        Magistrate Judge Abel
Commissioner of Social Security,
                Defendant          :

## REPORT AND RECOMMENDATION

Plaintiff Anna Peppers-Moss brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security denying her application for Social Security Disability benefits.  This matter is before the  Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.** Anna Peppers-Moss was 49 years old on her alleged onset date. Plaintiff alleges that she is disabled because of osteoarthritis in her hip, hand and spine.  She has a high school education. Despite working as fast food worker, she has no past relevant work. The administrative law judge found that Peppers-Moss retained the ability to perform a reduced range of light work.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed substantial error by failing to fully assess and accord appropriate weight to the opinions of plaintiff's treating sources as directed by the Appeals Council;

- The administrative law judge's assessment of plaintiff's residual functional capacity is not supported by substantial evidence;

- The administrative erroneously relied on vocational expert testimony given in response to a hypothetical question premised on an improper residual functional capacity assessment.

**Procedural History.**  Plaintiff Anna Peppers-Moss filed her application for disability insurance benefits on December 22, 2003, alleging that she became disabled on December 15, 2003, at age 49, by osteoarthritis in her hip, hand and spine.  (R. 95, 94N.) The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On June 12, 2007, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 805.)  A vocational expert also testified.  On July 30, 2007, the administrative law judge issued a decision finding that Peppers-Moss was not disabled within the meaning of the Act.  (R. 57.)  On September 9, 2008, the Appeals Council remanded the case and instructed the administrative law judge to:

- Give consideration to the treating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the opinion (20 CFR 404.1512). The Administrative Law Judge will establish nonexertional mental limitations consistent with the ratings of the four functional areas of limitation.
- Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529) and Social Security Ruling 96-7p.
- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545

2

and Social Security Ruling 96-8p). The Administrative Law Judge will
establish nonexertional mental limitations consistent with the ratings of the
four functional areas of limitation.

- Issue a decision at step 5 of the sequential evaluation process.
- If warranted by the expanded record, obtain evidence from a vocational
  expert to clarify the effect of the assessed limitations on the claimant's
  occupational base (Social Security Ruling 83014, and *Shelman v. Heckler*, 821
  F.2d 316, 321-322 (6th Cir. 1987)). The hypothetical questions should reflect
  the specific capacity/limitations established by the records as a whole. The
  Administrative Law Judge will ask the vocational expert to identify
  examples of appropriate jobs and to state the incidence of such jobs in the
  national economy (20 CFR 404.1566). Further, before relying on the
  vocational expert evidence the Administrative Law Judge will ask the
  vocational expert to identify examples of appropriate jobs and to state the
  incidence of such jobs in the national economy (20 CFR 404.1566). Further,
  before relying on the vocational expert evidence the Administrative Law
  Judge will identify and resolve any conflicts between the occupational
  evidence provided by the vocational expert and information in the
  Dictionary of Occupational Titles (DOT) and its companion publication, the
  Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(R. 35-37.)

On December 18, 2008, the administrative law judge held a second hearing, at

which plaintiff, represented by counsel, appeared and testified.  (R. 835.)  A vocational

expert also testified. On January 29, 2009, the administrative law judge issued a decision

finding that plaintiff was not disabled within the meaning of the Act. On September 23,

2010, the Appeals Council denied plaintiff's request for review and adopted the

administrative law judge's decision as the final decision of the Commissioner of Social

Security. (R. 7-9.)

**Age, Education, and Work Experience**.  Anna Peppers-Moss was born August 13, 1954.   (R. 95.) Peppers-Moss has a high school education.  (R. 94T.)  She has worked as a food preparer and cook.  She last worked December 7, 2003.  (R. 94N-94O.)

**Plaintiff's Testimony**.  The administrative law judge fairly summarized Peppers-Moss's testimony as follows:

> The claimant testified at the December 18, 2008 supplemental hearing that she was born on August 13, 1954 and she is now 54 years old. She is five feet, seven and a half inches tall and she now weighs 175 pounds, which is about the same as she weighed at the prior hearing and about 35 pounds more than her weight of 140 pounds on her alleged onset date. She has married and her name is now Anna (Peppers) Moss, rather than Anna R. Peppers. She lives alone, as her husband is in prison. The claimant has three grown children, including two daughters and a son who is also in prison. She has no dependent children. She has a high school education and has had no vocational training in the last 15 years.

> The claimant alleges that she has been disabled since December 15, 2003. She worked after that date, earning a little over $5,000.00 in 2004 and almost $7,000.00 in 2005, with just a small amount of earnings in 2006. She started working as a part time prep cook for Casa Del Taco in 2002. After that, she worked at a number of factory/labor jobs, as a housekeeper, and at jobs requiring her to be on her feet all day and lift 20 pounds or more, up to 50 pounds. She was never a supervisor. She said that she had worked briefly in 2007 but that she has not worked since that date.

> The claimant testified that her carpal tunnel syndrome and her knee pain is about the same as it was at the earlier hearing, and that her left hip pain, spine pain, and depression are all worse. She is not seeing a physician presently, although she saw a psychologist {Kenneth Lloyd} for a few months and then stopped because the more she went, the more depressed she became. She still used a wrist-thumb brace, but she did not wear it to the hearing. She wears splints on her wrists at night and she sometimes uses a cane. She no longer takes Vicodin, and in fact, takes NO prescription medications presently. She has not had any surgery since the prior hearing.

4

The claimant next testified that she tries not to walk at all, as her left side gives way on her and she will fall; she has fallen three or four times. At the prior hearing, the claimant had testified that she could stand for 30 minutes at a time, but now the claimant said the her leg will give way so she can stand just ten minutes at a time. She now has arthritis in both shoulders, and she still has the lifting, carrying, and stair-climbing limitations that she had testified to previously. She has difficulty sleeping because she no longer has medication to help her sleep. She has not driven a car for the past four years. Although she had been doing aerobic exercises, she gave those up. She also does not do the exercises for her thumb and finger that were prescribed by her doctor.

The claimant has no hobbies, but she watches television. She occasionally visits friends and relatives, but she does not go to restaurants or movies or church. She is able to bathe, dress, and care for her personal hygiene without assistance most of the time. She is able to cook for herself and do a little light housework, but a friend does her dishes and the claimant's daughters help her with the laundry and grocery shopping. The claimant talks to her daughters on the phone every day and she naps through the day at various times. The claimant testified that she has been using crack cocaine but that she gave up street drugs a year and a half earlier, and she now drinks just an occasional beer.

(R. 22.)

**Medical Evidence of Record.**  The administrative law judge's decisions fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence with respect to plaintiff's physical impairments.

Greg Cush, M.D. On September 10, 2002, Dr. Cush evaluated plaintiff for complaints of right thumb pain for the past several months. Dr. Cush found positive Finkelstein's maneuver with tenderness to palpation over the first dorsal compartment and basilar right thumb joint. (R. 211.) X-rays revealed severe advanced osteoarthritis involving the basilar thumb joint and right Dequervain's tenosynovitis. On October 7,

5

2002, plaintiff returned for follow up care subsequent to an open release of right trigger thumb. She was permitted to return to work on October 23, 2002. (R. 210.) On November 26, 2009, plaintiff returned with complaints of tenderness and swelling. Dr. Cush concluded her complaints were the result of mild post-operative swelling and recommended that she ice her hand. (R. 210.)

On February 5, 2003, plaintiff complained of pain and swelling in her right thumb. Dr. Cush found tenderness to palpation over the A-1 pulley and basilar thumb joint. Dr. Cush diagnosed continued right-sided basilar thumb joint arthritis and early right trigger thumb. (R. 209.) On September 2, 2003, Dr. Cush examined plaintiff and reviewed x-rays. The x-rays revealed degenerative joint disease of her left hip and lumbar spine and a right trigger thumb. Plaintiff also reported increased locking of her right thumb. (R. 208-09.) In October 2003, plaintiff underwent a second open release surgery for her right trigger thumb. On November 4, 2003, Dr. Cush recommended that plaintiff begin more aggressive range of motion exercises. (R. 208.)

On January 13, 2004, plaintiff complained of left-sided low back pain, left buttock, leg and foot pain and occasional numbness (R. 208.) Dr. Cush found sciatic tension signs with positive straight leg raising. (R. 207.) January 13, 2004 x-rays revealed degenerative joint disease of the left hip and lumbar spine with left-sided radiculopathy. Dr. Cush initially recommended epidural steroid injections, but when he discovered she did not have insurance he provided her with lumbar spine stabilization exercises. (R. 207.)

Martin Fritzhand, M.D. On February 25, 2004, Dr. Fritzhand performed a consultative examination. Plaintiff reported constant sharp low back pain radiating to the left hip and down the lateral aspect of her leg to her foot accompanied by left lower extremity numbness. Her pain increased with prolonged ambulation or standing and bending, stooping, or lifting heavy objects. Plaintiff also reported difficulty combing her hair with her right hand. Dr. Fritzhand found decreased right grip strength and numbness in her right thumb. (R. 212.) Dr. Fritzhand observed a limping, antalgic gait during the examination. Plaintiff had diminished pinprick and light touch over the left lower extremity and bilateral upper extremities except for the left hand. Dr. Fritzhand was unable to assess grasp strength of plaintiff's right hand. He noted her effort was poor. (R. 213.) Plaintiff had no joint abnormalities as heat, swelling, and capsule thickening were absent. There was no evidence of nerve root damage. All deep tendon reflexes were brisk, and there was no muscle atrophy. Dr. Fritzhand opined that plaintiff would be capable of performing a mild to possibly moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying.  (R. 214.) A February 25, 2004 x-ray of plaintiff's left hip revealed degenerative arthrosis. An x-ray of lumbar spine was normal. (R. 215.)

On March 31, 2008, Dr. Frizhand performed another evaluation of plaintiff's physical condition. (R. 735-37.) He concluded:

> [T]his is a middle-aged woman with a short history of pain and discomfort involving both shoulders. She has a history of polyartiuclar distress with well-documented degenerative joint disease. The patient

ambulates with a normal gait and can forward bend without difficulty.
Range of motion studies are diminished. There are no joint abnormalities
as heat, swelling and capsule thickening are absent. There is no evidence
of nerve root damage as all deep tendon reflexes are brisk and there is no
evidence of muscle atrophy. The right hand is dominant and grasp
strength and manipulative ability are well-preserved bilaterally.

Based on the findings of this orthopedic examination, the patient
appears capable of performing a moderate amount of sitting, ambulating,
standing, bending, pushing, pulling, lifting and carrying heavy objects.
She had no difficulty reaching, grasping or handling objects.

(R. 737.)

Kristine McCallum, M.D. On December 12, 2003, Dr. McCallum diagnosed left hip

osteoarthritis. Dr. McCallum indicated that plaintiff was unable to work because she was

in extreme pain. She wrote, "I really don't doubt this woman's sincerity. I've dealt with

her for the last couple of years now and I'm not suspicious of her having any secondary

gain here especially when I watched her hobble down the hall." (R. 521.) On February 11,

2003, plaintiff reported that Dr. Cush told her she needed to be on disability, but plaintiff

stated she wanted to work. Dr. McCallum encouraged her to apply for disability. (R.

514.)

On January 9, 2004, Dr. McCallum examined plaintiff based on complaints of left

hip pain. She found reproducible pain with internal and external rotation and pain with

flexion and extension. Flexion and extension were full, but she had pain. Strength in her

lower extremities appeared intact, although she may have been a little weaker on the left

side. (R. 510.) On May 11, 2004, Dr. McCallum restricted plaintiff to working 25 hours

per week with no heavy lifting or going up and down steps. She noted that plaintiff

8

continued to have a fair amount of pain and that she was "between a rock and a hard place in that she really isn't physical[ly] able to work full time, however she needs some sort of income to pay her rent." (R. 508.)

On June 7, 2004, plaintiff complained of pain in her left hip which caused her to fall when it gave out on her. Plaintiff also complained of left hand pain, mainly over her hypthenar eminence. Dr. McCallum performed a musculoskeletal examination that revealed full ranges of hip and knee motion with complaints of reproducible pain. (R. 507.)

A June 7, 2004 x-ray of plaintiff's left hip revealed a moderate degree of joint space narrowing with subchondral geodes seen in the femoral and acetabular component, which was most likely secondary to osteoarthritis. (R. 460.) A June 29, 2004 EMG/nerve conduction study revealed electrodiagnostic evidence of mild left median mononeuropathy. (R. 234-34A.)

On January 23, 2005, plaintiff fell and injured her right hand. Dr. McCallum diagnosed right hand pain. (R. 504.) On February 16, 2005, Dr. McCallum saw plaintiff after she injured her hand. Dr. McCallum noted that plaintiff was doing well other than currently going through a divorce. (R. 504.) On April 13, 2004, Dr. McCallum indicated she wanted plaintiff to see a rheumatologist because there was no explanation for plaintiff's multiple arthralgias. (R. 502.)

On October 24, 2005, Dr. McCallum filled out a form and indicated that plaintiff could stand/walk for 3-4 hours without interruption and for the same amount of time

9

during an eight-hour workday. Dr. McCallum did not know how many hours plaintiff could sit. She estimated that plaintiff could lift and carry 6-10 pounds. Plaintiff was moderately limited in pushing/pulling, bending, reaching, and handling. (R. 534.) Dr. McCallum's treatment note indicated that plaintiff continued to work at a restaurant. Her gait was within normal limits as was her range of motion. (R. 473.)

On March 31, 2006, Dr. McCallum examined plaintiff's right knee and found swelling and pain with any range of motion. Dr. McCallum advised plaintiff to see a rheumatologist and to stay on her medications as prescribed. A March 10, 2006 x-ray of plaintiff's right knee showed joint effusion and early degenerative changes. Dr. McCallum diagnosed osteoarthritis of the right knee. Dr. McCallum noted that plaintiff lost her job because her hands kept locking up one her. (R. 470.) On December 18, 2006, plaintiff described continued bilateral hand pain accompanied by numbness in her fingers and hands, with the right hand worse than the left. Dr. McCallum diagnosed bilateral hand pain. (R. 469.)

On November 9, 2006, Dr. McCallum reported that plaintiff underwent surgery on her right thumb, but she continued to have pain at the proximal joint. Plaintiff was being treated for low back pain, anxiety, stress, and arthritis. (R. 406.) On December 18, 2006, Dr. McCallum commented that plaintiff had recently undergone a knee replacement. She believed that plaintiff's hand problems constituted her most serious issue. (R. 469.)

On March 19, 2007, Dr. McCallum prescribed Vicodin for pain related to osteoarthritis in both hands. Although she noted plaintiff was in genuine pain, Dr. McCallum also described plaintiff as not being in acute stress. (R. 584.) On April 27, 2007, Dr. McCallum noted that plaintiff had osteoarthritis in both knees and both hips as well as in her LS spine to a fairly significant degree much more so than expected for her age group and for someone without risk factors like a history of heavy work. (R. 659.) Dr. McCallum believed that plaintiff's pain was genuine. On May 18, 2007, plaintiff reported experiencing hip pain during a 15-minute walk. Dr. McCallum described plaintiff as doing "okay." Plaintiff reported that she had become somewhat depressed and tearful because she was not able to work. (R. 658.)

Edmond W. Gardner, M.D. On April 26, 2004, Dr. Gardner,[1] a state agency doctor, completed a physical residual functional capacity assessment. Dr. Gardner opined that plaintiff could occasionally life and/or carry 50 pounds and frequently lift and/or carry 25 pounds. She could stand and/or walk about 6 hours in an 8-hour workday. She could sit for a total of about 6 hours in an 8-hour workday. Her ability to push and/or pull was unlimited. Dr. Gardner noted that x-rays of plaintiff's left hip only showed slight degenerative changes. A February 25, 2004 note indicated that plaintiff had no radiculopathy. She was able to walk with a limping gait without aids. She had full range of motion and was able to do straight leg raising to 90 degrees without difficulty. Dr. Gardner noted that despite plaintiff's failure to cooperate with muscle testing, she had

good range of motion. She had no significant loss of strength or atrophy. Although plaintiff was unable to grip on the right hand, she had no atrophy of the intrinsic hand muscles. Dr. Gardner opined that plaintiff was unable to perform frequent fine and gross manipulation with her right hand. Dr. Gardner concluded that plaintiff's reported symptoms were only partially credible. (R. 221-26.)

   Brian S. Cohen, M.D. On June 11, 2004, Dr. Cohen examined plaintiff based on her complaints of pain in her low back which radiated into her left hip and down into her left leg. She also complained of pain in her knee and left hand. She denied instability in her left leg, but she experienced occasional numbness and tingling. On physical examination plaintiff had painful motion of the left thumb at the carpometacarpal joint. She had good capillary refill and normal neurological evaluation. Examination of her lower extremities revealed no significant pain with passive range of motion of both hips, knees, and ankles. She had negative straight leg raise on the right, slightly positive on the left. Dr. Cohen reviewed x-rays which showed carpometacarpal arthritis. Her LS spine showed no significant arthritic change. Her pelvis and left hip showed cystic formation in acetabulum and early change in the femoral head of her knee. (R. 397-98.)

   A June 23, 2004 MRI of plaintiff's left lower extremity revealed chondromalacia of the left patella and very mild degenerative narrowing of the posterior horn of the medial meniscus. (R. 230-231.) On July 2, 2004, Dr. Cohen provided plaintiff with a brace for her left knee. (R. 396.)

---

   [1]Dr. Garner's name is followed by the specialization, "dermatology."

On April 5, 2004, plaintiff reported increased right knee pain and swelling for the past month. On examination, Dr. Cohen found swelling and decreased motion, including loss of full extension. Plaintiff was given a knee brace and prescribed an anti-inflammatory and an injection. (R. 295.)

On May 10, 2006, Dr. Cohen evaluated plaintiff based on complaints of right knee popping and catching. He found joint line tenderness on examination. (R. 575.) A review of plaintiff's May 19, 2006 x-ray of her right knee revealed a significant tear in the lateral meniscus and degenerative changes. (R. 394, 399-400.)

On June 16, 2006, plaintiff underwent right knee surgery for a lateral meniscal tear and arthritis.(R. 344-45.) Diagnostic arthroscopy revealed grade 2-3 wear on the undersurface of the patella, grade 3-4 wear in the trochlear groove, and grade 4 changes on the tibial plateau and lateral femoral condyle. (R. 344.)

On September 18, 2006, plaintiff underwent a right total knee replacement. (R. 368, 374-75, 391.)

On September 27, 2006, Dr. Cohen completed a medical source statement on plaintiff's physical capacity. Plaintiff could only lift and/or carry five pounds. She could only stand for one hour with assistance. Without interruption, she could only stand for a half an hour. She could sit for a total of two hours in an eight-hour day. She could only sit for a half an hour without interruption. Her right leg required elevation. Plaintiff could rarely balance. She could never climb, stoop, crouch, kneel, or crawl. She could occasionally reach or handle. She could never push or pull. She could frequently perform

13

feeling, and fine and gross manipulation. She was restricted from heights, moving machinery and temperature extremes. She had been prescribed a walker and a brace. She required a sit/stand option. She experienced moderate to severe pain. (R. 385-85A.)

In a September 27, 2006 treatment note, Dr. Cohen noted that x-rays showed the components of plaintiff's knee to be well-aligned and well fixed. (R. 389.)

On October 11, 2006, Dr. Cohen noted that plaintiff had almost full extension and excellent flexion following her right total knee replacement. (R. 388.) On November 8, 2006, Dr. Cohen saw plaintiff for follow-up for her right knee replacement. She was doing well and had good motion. There was no instability. Dr. Cohen indicated that she would continue to advance with her exercises. (R. 387.)

On November 14, 2006, plaintiff fell and strained her right knee. (R. 562.)

W. Bradley Strauch, M.D. On September 6, 2007, Dr. Strauch evaluated plaintiff's right knee following an injury that occurred when her knee gave out while she was walking. On examination, Dr. Strauch found evidence of quadriceps wasting when compared to the opposite, specifically the VMO. She had tenderness to palpation over the entire MCL, primarily at its origin of the medial femoral condyle as well as over the medial joint line. (R. 638.) Dr. Strauch noted discomfort with McMurray's and pain with valgus stress, and discomfort at the medial part of the knee with squat. Dr. Strauch diagnosed right knee pain, right MCL sprain, and mild medial hamstring tendinopathy. (R. 638.)

<u>Adena Health System</u>. On June 16, 2004, plaintiff underwent an initial evaluation for physical therapy. She had 25% loss of lumbar extension, 100% loss of lumbar flexion due to pain, and her bilateral lower extremity strength decreased to 4+/5. (R. 227.) Plaintiff reported she could sit, stand, and walk for only 15 minutes at a time. (R. 227.)

A June 23, 2004 MRI of plaintiff's lumbar spine revealed degenerative L4-5 disk with a mild degree of narrowing of the neural foramen due to the bulging disk and mild facet hypertrophy. A June 23, 2004 MRI of plaintiff's knee revealed chondromalacia of the left patella and very mild degree of degenerative narrowing of the posterior horn of the medial meniscus. (R. 230-31.) On July 26, 2011, plaintiff received a lumbar epidural steroid injection for lumbar radiculitis. (R. 235.)

On November 28, 2007, plaintiff presented at the emergency department with complaints of chronic pain in her hips and back. On examination, plaintiff had diffuse tenderness of the thoracic and lumbar spine. (R. 721-22.) Dr. Schneider diagnosed degenerative arthritis of the hips and spine and noted the pain appeared musculoskeletal in nature. Her joints were painful with movement. (R. 722.) On September 15, 2008, plaintiff returned to the emergency room due to an exacerbation of her chronic back pain accompanied by intermittent radiating pain into her left knee. (R. 777-78.)

<u>Rebecca Neiger, M.D.</u> On September 6, 2004, Dr. Neiger, a state agency physician, completed a physical residual functional capacity assessment. Dr. Neiger concluded that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift ad/or carry 10

pounds. She could stand and/or walk about 6 hours in an 8-hour workday. She sit for a total of 6 hours in an 8-hour workday. Her ability to push and/or pull was unlimited. Plaintiff could frequently climb ramps or stairs but never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crawl and crouch. She was limited in her ability to perform fine and gross manipulation. Plaintiff's allegations were found to be only partially credible. (R. 245-49.)

Kevin D. Hackshaw, M.D. On June 2, 2005, Dr. Hackshaw examined plaintiff, who had tenderness intertrochanteric bursa bilaterally. (R. 325.) Dr. Hackshaw diagnosed trochanteric bursa, chronic back pain due to a bulging disc with intermittent numbness and tingling in her lower extremities, and osteoarthritis of multiple joints. (R. 324-25.) Dr. Hackshaw noted that plaintiff's symptoms had worsened significantly over the past five months. She had experienced several episodes of locking of her bilateral hips. Plaintiff had crepitus in both knees and prominent bony enlargement of first caropmetacarpal joints bilaterally.  (R. 325.)

Zhanna Mikukik, M.D. On July 7, 2005, Dr. Mikukik evaluated Peppers-Moss for complaints of continued pain in both hips, knees, and lower back. An MRI of plaintiff's hips showed acetabular sclerosis, cyst formation bilaterally and findings suggestive of bilateral osteoarthritic changes, more pronounced on the left side. On examination, plaintiff had tenderness at the left trochanteric bursa. Dr. Mikulik diagnosed osteoarthritis and left trochanteric bursitis for which plaintiff received a local injection.

16

Dr. Mikulik also examined plaintiff for complaints of continued pain in her hand and the base of her thumbs bilaterally. (R. 322.)

Stephen David Watson, M.D., Ph.D. On August 1, 2005, Dr. Watson examined plaintiff for her complaints of unbearable low back pain with numbness in her low back and left leg down to her ankle. On examination, plaintiff had decreased sensation in the left lateral lower leg, positive stressing sacro-iliac joints and tenderness over lumbar processes and posterior spinous processes, with the left side being worse than the right. Dr. Watson recommended a nerve conduction test to assess the extent of her nerve damage. Dr. Watson diagnosed probable lumbar radiculopathy and possible lumbar facet syndrome and inflamation of tendons of origin right to the gluteus maximus muscle. (R. 331-32.) The nerve conduction test revealed marked diminished function of the right posterior femoral cutaneous nerve, severe diminished function of the left posterior femoral cutaneous nerve, and very severe diminished function of the bilateral L4 saphenous nerve and right L5 peroneal nerve. (R. 335.) On August 2, 2005, Dr. Watson diagnosed bilateral lumbar radiculopathy and performed left L4, L5, S1 and S2 selective nerve root steroid injections. (R. 329.)

Neil Ghany, M.D. On March 7, 2007, Dr. Ghany diagnosed plaintiff with bilateral carpal tunnel syndrome and severe thumb carpometacarpal osteoarthritis. An examination revealed positive Durkan's Tinel's and Phalen's signs at the wrist, positive Tinel's sign at the elbow on the left, significant carpometacarpal grind and a lot of pain around the carpometacaropal joint on the right. Bilateral x-rays revealed severe

17

osteoarthritis of the thumb carpometacarrpal joints and mild STT arthritis on the right. (R. 558-60.)

On March 27, 2007, plaintiff underwent a right thumb carpometacarpal arthroplasty with flexor carpi radialis suspension and carpal tunnel release surgery. (R. 564.) On June 27, 2007, Dr. Ghany observed quite a bit of stiffness remaining in plaintiff's hand twelve weeks status post surgery. (R. 640.) The area around the carpometacarpal joint on her left hand was very painful. (R. 594, 596.)

Diane Manos, M.D. On November 27, 2007, Dr. Manos, a state agency physician, completed a physical residual functional capacity assessment. Dr. Manos opined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk about 6 hours in an 8-hour day. She could sit for about 6 hours in an 8-hour day. She was unlimited in her ability to push and/or pull. Her ability to perform fine manipulation was limited. (R. 720-34.)

**Administrative Law Judge's Findings.**

1.  The claimant meets the insured status requirements of the Social Security Act at least through December 31, 2010.

2.  The claimant has not engaged in any substantial gainful activity since December 15, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following impairments: arthritis in her hips, bilateral carpal tunnel syndrome, "multiple arthralgias" of uncertain etiology, and adjustment disorder with a GAF of 70, and a history of a knee replacement in September 2006, with an uneventful recovery (20 CFR 404.1521 *et seq.* And 416.921 *et seq.*). Collectively, these impairments are severe because they substantially compromise the claimant's ability to perform basic work functions.

18

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform <u>a reduced range of light work</u> as defined in 20 CFR 404.1567(b) and 416.967(b).

6.      The claimant has no past relevant work, as her past work was not "substantial gainful activity" according to the Appeals Council (20 CFR 404.1565 and 416.965).

7.      The claimant was born on August 13, 1954 and she was 49 years old, which is defined as a younger individual, on the alleged disability onset date. The claimant subsequently changed age category (at age 50) to "closely approaching advanced age" (20 CFR 404.1563 and 416.963).

8.      The claimant has a high school education and she is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      The claimant has no acquired, transferable work skills (20 CF 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1569, 4041569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, at any time from December 15, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 18-25.)

        **Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of

the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389,

401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is

"'more than a mere scintilla.'" *Id*. *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

1976). The Commissioner's findings of fact must be based upon the record as a whole.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff argues that the decision of the Commissioner

denying benefits should be reversed because:

- The administrative law judge committed substantial error by failing to fully
  assess and accord appropriate weight to the opinions of plaintiff's treating
  sources as directed by the Appeals Council. Plaintiff argues that the
  administrative law judge failed to consider Dr. McCallum's May 11, 2004
  assessment as ordered by the Appeals Council. Dr. McCallum restricted
  Peppers-Moss to working 25 hours per week with no heavy lifting or going
  up and down steps. Dr. McCallum found that plaintiff continued to have a
  fair amount of pain and was incapable of working full time although she

20

required income to pay her rent. Plaintiff also argues that the administrative law judge ignored the Appeals Council's order to evaluate Dr. McCallum's October 24, 2005 assessment. Although the administrative law judge mentioned the October 24, 2005 assessment, he did not evaluate the opinion nor explain why the opinion was not accepted.

- The administrative law judge's assessment of plaintiff's residual functional capacity is not supported by substantial evidence.  Plaintiff argues that the administrative law judge gave little or no weight to the opinions of her treating physicians. The administrative law judge relied on the reports of Dr. Neiger and Dr. Manos and concluded that the reports were consistent with one another. Dr. Manos indicated that plaintiff was limited to frequent fine manipulation on the right. Dr. Neiger, however, indicated that plaintiff's fine and gross manipulation was limited to frequent handling and fingering on the left.  The administrative law judge concluded that plaintiff could use her left hand only for fine and gross manipulation. The medical evidence overwhelmingly reflects that plaintiff's hand limitations are bilateral. Plaintiff maintains that the administrative law judge's decision is based upon a selective interpretation of the evidence. Plaintiff contends that the administrative law judge left out significant parts of her testimony and distorted the medical findings and

21

opinions of her treating doctors. The administrative law judge mentioned plaintiff's total right knee replacement with an "uneventful recovery." The administrative law judge failed to mention the pain plaintiff experienced for the two years prior to her surgery and her injuries to the knee following surgery. The administrative law judge also failed to mention the August 1, 2005 conduction study results showing objective findings of severe and marked diminished function in her right posterior femoral cutaneous nerve, left posterior femoral cutaneous nerve, right L5 peroneal nerve and bilateral L4 saphenous nerve. The administrative law judge mistakenly believed that Dr. McCallum began treating plaintiff in September 2003. The administrative law judge also left out significant findings from the February 25, 2004 evaluation of Dr. Fritzhand.

- The administrative erroneously relied on vocational expert testimony given in response to a hypothetical question premised on an improper residual functional capacity assessment. In reaching his decision that plaintiff was not disabled, the administrative law judge relied on the vocational expert's testimony, but the hypothetical question posed to the vocational expert inaccurately described plaintiff's ability to stand/walk, lift, and use her hands. The administrative law judge concluded that plaintiff could use her left hand only for fine and gross manipulation, but the hypothetical posed

22

to the vocational expert limited her to frequent use of her left and no

limitation to the use of her right hand. The residual functional capacity

formulated by the administrative law judge conflicts with the opinion of

Dr. McCallum. Dr. McCallum limited plaintiff to standing or walking 3 to 4

hours in an 8-hour workday and lifting 6 to 10 pounds frequently or

occasionally. Her ability to use her hands is limited bilaterally, with the

right hand worse than the right.

**Analysis.**  Treating Doctors' Opinions.  Plaintiff argues that the Administrative

Law Judge erred in rejecting the opinion of Dr. McCallum as set forth in her May 11,

2004 assessment.

Treating Doctor: Legal Standard.  A treating doctor's opinion[2] on the issue of

disability is entitled to greater weight than that of a physician who has examined

---

[2]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

plaintiff on only one occasion or who has merely conducted a paper review of the medi-cal evidence of record. 20 C.F.R. § 404.1527(d)(1). *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2). When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commission-er of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558

F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[3].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the

---

[3]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*  When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ."  The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion.  When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source."  20 C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.,* opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

26

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight

to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

28

     <u>Treating Doctor: Discussion</u>.  With respect to Dr. McCallum's opinion, the

administrative law judge stated:

> I have also considered opinion evidence in accordance with the
> requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p
> and 06-3p. As for the opinion evidence, Dr. McCallum has been the
> claimant's treating family doctor since September 2003 (Exhibit 28F, pp. 1-
> 42). After just a few months of treatment, in December 2003, Dr.
> McCallum said that she "truly believed the claimant needed to get on
> disability" (Exhibit 29F, page 56). The claimant's attorney submitted an
> <u>undated</u> statement from Dr. McCallum that "my opinion is that Anne
> Peppers is unable to perform any physical work (involving standing,
> lifting,) due to severe osteoarthritis" (Exhibit 32F). That statement is
> addressed under the claimant's maiden name, Peppers, rather than her
> married name, Moss, and it is not clear when and under what
> circumstances it was written. It is inconsistent with the findings of, for
> example, Dr. Fritzhand, and it may have been written right after surgery
> or another acute event. For all these reasons, it can be given little or no
> weight.
>
>     By contrast, the claimant was later referred to a rheumatologist, as
> Dr. McCallum did not know why the claimant "hurts in all the places she
> said she hurt", and x-rays were unremarkable (Exhibit 29F, page 37). That
> physician had also described the claimant as "quite healthy" except for a
> history of surgical menopause and osteoarthritis (Exhibit 18F). In February
> 2005, the claimant admitted to a history of cocaine and benzodiazepam
> abuse (Exhibit 18F), and her blood tested positive for cocaine in January
> 2005, April 2005, and June 2005 (Exhibit 28F, pages 43-46.)
>
>     In October 2005, Dr. McCallum stated that she did not know how
> long the claimant could sit in a workday. The physician did not state
> whether the claimant was "employable" or not (Exhibit 29F, pages 68 and
> 69).
>
>     In March 2006, the physician <u>refused</u> to give the claimant a
> statement that she was "unable to work" (Exhibit 29F, pages 5 and 6).
>
>     It appears that Dr. McCallum considered the claimant unable to
> work for brief periods, such as following her knee surgery, but that as
> recently as 2006, she did NOT consider her to be disabled. (Exhibit 29F,
> pages 5 and 6).

(R. 23.)

Plaintiff refers to Dr. McCallum's May 11, 2004 assessment, but defendant correctly notes that the record does not contain an assessment from Dr. McCallum dated May 11, 2004. Rather, Dr. McCallum stated in a May 11, 2004 treatment note that she provided plaintiff with a note to give to her employer at her request. Plaintiff asked for a note indicating that she was restricted to working 25 hours per week and that she needed to avoid heavy lifting and using the steps. (R. 508.) Given that plaintiff specifically asked Dr. McCallum to write a note with these restrictions, the note does not necessarily reflect Dr. McCallum's opinion as to the limitations to plaintiff's ability to perform work-related activities based on her medical findings. The note was based on plaintiff's subjective complaints rather than objective findings. In fact, the treatment note contains no objective findings demonstrating the need for the restrictions as outlined in the note to plaintiff's employer. As a result, the administrative law judge did not err in failing to adopt the opinion of Dr. McCallum.

Residual Functional Capacity Assessment. The administrative law judge concluded that plaintiff could perform a reduced range of light work. The administrative law judge's physical residual functional capacity assessment adopted the conclusions of Dr. Neiger, a state agency physician. Dr. Neiger concluded that plaintiff could lift ten pounds frequently and 20 pounds occasionally. She could sit for six hours and stand/walk for six hours in an eight hour workday. She could use her left hand only for fine manipulation, and she could occasionally stoop, kneel, crouch, and crawl. She could not climb ladders, ropes or scaffolds. (R. 20.) The residual functional capacity assessment

30

is also consistent with the assessment completed by Dr. Manos. (R. 726-33.) Plaintiff's assertion that the administrative law judge distorted the medical evidence is not persuasive. Here, the administrative law judge considered the evidence and relied on the opinions of two state agency physicians. It is the responsibility of the administrative law judge to evaluate conflicting medical evidence and determine what weight to give each opinion. The administrative law judge considered the evidence of record and formulated a residual functional capacity assessment supported by two state agency physicians. Therefore, the record contains substantial evidence supporting the residual functional capacity assessment formulated by the administrative law judge.

Accuracy of Hypothetical Given Vocational Expert: Legal Standard.  Plaintiff argues that the Administrative Law Judge's hypothetical to the vocational expert was not supported by substantial evidence because the residual functional capacity finding of the administrative law judge conflicts with the opinion of Dr. McCallum.

In determining whether a claimant is disabled, an administrative law judge makes a residual functional capacity determination.  That finding is an "assessment of the claimant's remaining capacity for work" once his or her limitations have been taken into account.  20 C.F.R. § 416.945.  It is "a more complete assessment of her physical and mental state and should include an 'accurate[ ] portray[al] [of her] individual physical and mental impairment[s].'  *Varley,* 820 F.2d at 779;  *Myers v. Weinberger,* 514 F.2d 293, 294 (6th Cir.1975) (per curiam)."  *Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002).

31

When a vocational expert testifies, the administrative law judge asks the expert to assume certain facts about the claimant's work abilities.  The facts in this hypothetical are the administrative law judge's residual functional capacity findings.  The administrative law judge must accurately state each limitation that affects the claimant's ability to work.  If there is not substantial evidence supporting the limitations the administrative law judge includes in the hypothetical to the  vocational expert, then the expert's testimony is not substantial evidence supporting the Commissioner's decision denying benefits.  *Howard,* 276 F.3d at 240-42.  If a limitation that substantially affects the claimant's ability to work is established by uncontroverted medical evidence, it is error for the administrative law judge to omit this limitation from the hypothetical given the administrative law judge.  276 F.3d at 242.

Accuracy of Hypothetical Given Vocational Expert: Discussion.  As previously stated, the residual functional capacity assessment formulated by the administrative law judge is supported by substantial evidence in the record. Plaintiff maintains that the administrative law judge's decision states that plaintiff could use her left hand only for fine and gross manipulation. The hypothetical posed to the vocational exert limited plaintiff to only frequent as opposed to continuous use of her left hand and with no limitations on her right hand. Based on the hypothetical, the vocational expert concluded that significant numbers of jobs existed that plaintiff could perform.

Although the administrative law judge's decision is somewhat unclear, it appears that he intended to formulate a physical residual functional capacity that limited plaintiff

32

to only frequent fine and gross manipulation on the left with no restriction on her right hand. The administrative law judge adopted the opinion of Dr. Neiger, who opined that plaintiff was only limited with respect to her left hand. (R. 247.)

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

      s/Mark R. Abel          
      United States Magistrate Judge